UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TOWN OF ABITA SPRINGS                    CIVIL ACTION

VERSUS                                   NO: 15-451

U.S. ARMY CORPS OF                       SECTION: "J"(4)
ENGINEERS, ET AL

## ORDER & REASONS

Before the Court is a *First Motion for Partial Summary Judgment Vacating the U.S. Army Corps' Permit* **(Rec. Doc. 18)** filed by Plaintiff, the Town of Abita Springs ("Abita Springs" or the "Town"); an opposition thereto (Rec. Doc. 35) filed by Defendants, United States Army Corps of Engineers, Lieutenant General Thomas P. Bostick, John M. McHugh, and Martin S. Mayer (collectively, the "Corps"); an opposition thereto (Rec. Doc. 67) filed by Intervenor Defendant, Helis Oil & Gas Company, L.L.C. ("Helis"); Plaintiff's *Supplemental Motion for Summary Judgment Vacating the U.S. Army Corps' Permit* **(Rec. Doc. 70)**; Helis's opposition thereto (Rec. Doc. 71); Abita Springs' reply thereto (Rec. Doc. 82); the Corps' *Cross-Motion for Summary Judgment* **(Rec. Doc. 76)**; and Abita Springs' opposition thereto (Rec. Doc. 78). The motions were set for hearing, with oral argument, on December 2, 2015. Having considered the motions, legal memoranda, and arguments of counsel;

the record; and the applicable law, the Court finds that Abita Springs' motions should be **DENIED** and the Corps' cross-motion should be **GRANTED** for the reasons set forth more fully below.

## FACTS AND PROCEDURAL BACKGROUND

This dispute derives from the Corps' decision to grant Helis a permit to dredge and fill wetlands under section 404 of the Clean Water Act, 33 U.S.C. § 1344. Helis has proposed an exploration and production project that will be conducted in two separate phases, referred to as "Phase 1" and "Phase 2" respectively. AR 809.[1] Phase 1 comprises the development of a site for the drilling of a vertical well in order for Helis to obtain information regarding the production potential of a subsurface geologic formation over two miles below the land surface from which Helis plans to extract oil and gas. *Id.* If the data collected from the vertical well confirms the potential for economically viable mineral production from the target zone, Helis intends to implement Phase 2, which will consist of the development of a site to support the drilling of a horizontal well advanced from the vertical well drilled in Phase 1. *Id.*

---

[1]The Court will cite to documents contained in the Court's record as "Rec. Doc. [X]" and administrative record documents as "AR [X]," because the administrative record documents themselves are not contained in the Court's record. Instead, because of their voluminous nature, the Corps provided the Court and Plaintiff with a compact disc containing fully Bates numbered copies of the documents comprising the administrative record. (Rec. Docs. 68-3, 72-1.) The administrative record is incorporated into the Court's record by Notice of Manual Attachment. (Rec. Docs. 68-3, 72-1.)

Helis initially sought a permit that would cover both phases of its proposed project. On April 14, 2014, the Corps published a public notice of Helis's original permit application to construct a drill-site well pad, approximately 10.55 acres in size, that would accommodate an oil and gas exploration well and multiple hydraulic fracturing ("fracking") wells. AR 4857. Due to public interest, the Corps granted two time extensions to the comment period, which ended on June 16, 2014. AR 4950. On July 29, 2014, a Geologic Review[2] meeting coordinated by the Corps and facilitated by the Louisiana Geological Survey ("LGS") was held to discuss the geological aspects associated with the proposal. *Id.* In attendance were representatives from the Louisiana Department of Wildlife and Fisheries ("LDWF"), Louisiana Department of Environmental Quality ("LDEQ"), U.S. Environmental Protection Agency ("EPA"), along with representatives for Helis and the Corps. AR 400. After reviewing the information presented by Helis, John E. Johnston III of the LGS, the consulting geologist at the Geologic Review meeting, concluded that there existed "[n]o less damaging feasible alternatives" to the location selected by Helis for its proposed project. AR 358. However, Johnston determined that the site had no

---

[2] "Geologic Review is an ongoing program created by the Louisiana Geological Survey in 1982 which provides regulatory technical assistance to the Coastal Management Division (CMD) of the Louisiana Department of Natural Resources and to three districts of the U.S. Army Corps of Engineers (USACE)." *Geologic Review*, Louisiana Geological Survey, http://www.lgs.lsu.edu/deploy/content/GEORV/index.php (last visited Dec. 23, 2015).

more than a fifty percent chance of becoming a viable production site. AR 400. As a result, Johnston recommended that a single exploratory well be constructed to obtain better data to assess the viability of producing oil and gas at the site. *Id*. He also recommended that Helis reduce the size of its fill for the well pad from approximately 9.46 acres to 3.2 acres. AR 400-01. The LDWF, LDEQ, EPA, and the Corps agreed with the recommendations, and the Corps suggested that Helis submit revised plans proposing a single exploratory well with a maximum 3.2 acres of fill, "based on a revised purpose to obtain additional data/information to evaluate the viability of producing fossil fuels in this specific geographical area." AR 4951; *accord* AR 400-01.

On October 3, 2014, Helis submitted an amended permit application that reduced the scope and footprint of the proposed work. As requested by the Corps, Helis amended its initial permit application to encompass the surface development required for Phase 1 of the project only,[3] i.e., the drilling of the vertical well, and reduced the size of the well pad. AR 524-25. The Corps determined that the application was complete and issued a public notice on October 14, 2014. AR 512. The public notice indicated that the Corps and LDEQ were soliciting public comments for a

---

[3] The Corps "views this project as a 'standalone' activity to determine if the oil and gas reserves within the target formation can be economically extracted. If fracking procedures are proposed at this site, additional evaluation and authorization by [the Corps] and other agencies will be required." AR 4972.

period of thirty days. AR 513. Accordingly, the period ended on November 13, 2014. During the public comment period, the Corps received over 100 comments from individuals and organizations. (Rec. Doc. 35-1, at 3.) After the comment period closed, the Corps received more than eighty additional comments from the public. *Id.* According to the Corps, all comments received, including those submitted by Abita Springs after the close of the comment period, were considered in the Corps' decision-making process. (Rec. Doc. 76-1, at 10.)

After the close of the comment period, the Corps sent two letters to Helis. On December 2, 2014, the Corps sent Helis a letter asking for its response to comments received from the public. AR 2962. In addition, the Corps sent Helis a letter on December 4, 2014,[4] requesting Helis's response to the EPA's and the Corps' comments. AR 2968. In particular, the Corps requested that Helis respond to the EPA's concerns that Helis had not considered alternative non-wetland sites for its project. *Id.* The Corps also asked Helis to respond to the EPA's request that Helis examine opportunities to minimize wetland impacts by reducing or reconfiguring the project's footprint. *Id.* Further, the Corps asked Helis to respond to its own concerns about whether Helis had

---

[4] The parties agree that the November 4, 2014 date on the letter is a typographical error. The date should read December 4, 2014. The letter references and attaches an email dated November 13, 2014, and therefore could not have been issued on November 4, 2014.

developed contingency plans and best management practices in order to prevent pollution in the event of flooding. AR 2968-69.

On January 2, 2015, Helis provided the Corps with a detailed twenty-five page response to comments and requests for information, along with twenty-one attached exhibits. AR 3609. In total, Helis's response and exhibits amount to over 500 pages. AR 3609-4115. Despite Abita Springs' request, the Corps failed to reopen the public comment period after Helis submitted the additional information. AR 4239. On February 25, 2015, after reviewing Helis's response, the EPA advised the Corps that it did not object to the proposed project. AR 4515. On March 19, 2015, the LDEQ concluded "the discharge of fill material for the construction of a well pad and an exploratory vertical well to obtain geologic data to confirm the production potential of a very specific subsurface geologic zone will not violate water quality standards" and issued Helis a Water Quality Certification. AR 4611. In May 2015, Brad Laborde, the Corps project manager assigned to the permit, communicated with John Johnston to ask for additional information concerning less damaging alternatives.[5] AR 4826. Johnston reiterated that "[a]ll of the locations were reviewed and the least damaging feasible location was selected." AR. 4830.

---

[5] In his email, Laborde stated, "I'm still at a knowledge disadvantage on this project since I wasn't involved for much of the review." AR 4826. Laborde took over for Robert Tewis as the Corps project manager for the subject permit in February 2015. AR 4518, 4826-27.

The Corps prepared a Memorandum for Record approving the permit application on June 5, 2015. AR 4950. The Memorandum for Record addressed all substantive issues raised by the public comments received and contained the Corps' analysis required by the Clean Water Act and National Environmental Policy Act, including the Corps' "Environmental Assessment," "404(b)(1) Guidelines Evaluation," "Public Interest Review," and "Statement of Findings." AR 4950-5048. The Corps found that "the proposed action would not have a significant impact on aquatic resources and/or quality of the human environment; therefore, an Environmental Impact Statement [was not] required." AR 4984.

On June 8, 2015, the Corps issued Helis the permit. AR 5295. Specifically, the permit authorizes Helis to "[c]lear, grade, excavate, and deposit fill for a guard facility, three bypass roads, a well pad, and appurtenances to install and service a vertical exploratory test well." AR 5295. The proposed work will impact a total of 3.13 acres of wetlands. AR 4951.

The claims in this case arise under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*; the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Abita Springs filed its initial complaint and commenced this action on February 12, 2015, although the Corps had not yet issued the permit. (Rec. Doc. 1.) On June 26, 2015, Abita Springs filed its First Amended

Complaint, challenging the newly-issued permit. (Rec. Doc. 15.) In its First Amended Complaint, Abita Springs claims that the Corps followed unlawful procedures, failing to allow for public comment on more than 500 pages of documentation submitted by Helis to complete its application after the close of the public comment period. *Id.* at 2. Abita Springs also claims that the Corps issued the permit in violation of regulations that prohibit the Corps from authorizing destruction of wetlands unless the Corps reasonably concludes that there is no "practical alternative" that would have a less adverse impact on the aquatic ecosystem and that the Corps failed to conduct a lawful analysis of alternatives. *Id.* at 1-2.

On July 9, 2015, Abita Springs filed its *First Motion for Partial Summary Judgment Vacating the U.S. Army Corps' Permit* **(Rec. Doc. 18)**, originally set for hearing with oral argument on July 29, 2015. The Corps filed a Motion to Continue Plaintiff's First Motion for Partial Summary Judgment, arguing that Abita Springs' motion was premature because the administrative record had not yet been compiled and lodged. (Rec. Doc. 28-1, at 2.) The Court granted the Corps' motion on July 22, 2015, and continued the hearing on Abita Springs' motion until October 23, 2015. (Rec. Doc. 39.) In addition, the Court ordered the Corps to file the administrative record on or before September 20, 2015. *Id.* at 2.

On September 4, 2015, the Corps filed a Motion to Continue Administrative Record Due Date and Further Proceedings. (Rec. Doc. 59.) The Court granted the motion in part on September 16, 2015, and extended the Corps' deadline for filing the administrative record until October 20, 2015. (Rec. Doc. 64, at 7.) Further, the Court continued the hearing on Abita Springs' motion until December 2, 2015, and ordered Abita Springs to file any supplement to its motion by November 4, 2015, and Defendants to file any response to Abita Springs' motion by November 16, 2015. *Id.*

Abita Springs filed the instant *Supplemental Motion for Summary Judgment Vacating the U.S. Army Corps' Permit* **(Rec. Doc. 70)** on November 4, 2015. Helis opposed the motion on November 16, 2015. The Corps filed its *Cross-Motion for Summary Judgment* **(Rec. Doc. 76)** and brief in opposition to Abita Springs' supplemental motion on November 18, 2015.[6] Abita Springs opposed the Corps' cross-motion on November 24, 2015. In addition, the Court granted Abita Springs leave to file a reply in support of its supplemental motion on December 2, 2015.

## LEGAL STANDARD

When presented with a motion for summary judgment, a court normally considers whether the record, "viewed in the light most

---

[6] The Corps timely filed its cross-motion in response on November 16, 2015; however, the cross-motion was marked deficient because the attached memorandum exceeded the twenty-five page limit. (Rec. Doc. 73.) The Corps corrected the deficiency and refiled its cross-motion on November 18, 2015.

favorable to the non-moving party," evinces a genuine issue of material fact. *Tex. Comm. on Nat. Res. v. Van Winkle*, 197 F. Supp. 2d 586, 595 (N.D. Tex. 2002) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Hill v. London, Stetelman, & Kirkwood, Inc.*, 906 F.2d 204, 207 (5th Cir. 1990)). Only if the court answers the inquiry in the negative will the moving party be entitled to judgment as a matter of law. *Id.* This formula adjusts, however, when it arises in the context of judicial review of an administrative agency's decision. *Id.* In such cases, the "motion for summary judgment stands in a somewhat unusual light, in that the administrative record proves the complete factual predicate for the court's review." *Id.* (citing *Piedmont Envtl. Council v. U.S. Dep't of Transp.*, 159 F. Supp. 2d 260, 268 (W.D. Va. 2001)). The movant's burden is therefore "similar to his ultimate burden on the merits." *Id.*

Despite these necessary alterations to the usual analysis under Rule 56 of the Federal Rules of Civil Procedure, courts have held that summary judgment remains "an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995). When reviewing an administrative agency's decision, the district court must "determine whether as a matter of law, evidence in the administrative record permitted the agency to make the decision it

10

did, and summary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did." *Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052, 1064 (D. Ariz. 2001); *see also City of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).

A court will set aside or otherwise disturb nonadjudicatory agency action if the party pursuing judicial review shows that the agency "action, findings, and conclusions" are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if they were made "without observance of procedure required by law."[7] 5 U.S.C. § 706(2). "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The burden of proving that an agency decision was arbitrary or capricious [or made without proper

---

[7] Plaintiff seeks judicial review pursuant to section 702 of the APA, which allows those who are adversely affected by agency action, including the U.S. Army Corps of Engineers, to obtain judicial review of that action. 5 U.S.C. § 702. Section 706 sets forth the scope of judicial review, including the arbitrary and capricious standard. 5 U.S.C. § 706.

procedures] rests with the party seeking to overturn the agency decision." *Van Winkle*, 197 F. Supp. 2d at 596.

<u>**PARTIES' ARGUMENTS AND DISCUSSION**</u>

**A.    Standing**

**1.    Parties' Arguments**

Abita Springs contends that it satisfies the requirements for standing as set forth in Article III of the United States Constitution. First, Abita Springs claims that it has suffered concrete economic and aesthetic injuries because "[t]he Corps' violations in failing to provide a meaningful opportunity for notice and comment and failing to analyze non-wetland alternatives threaten Abita Springs' concrete interests." (Rec. Doc. 70-1, at 21.) In particular, Abita Springs argues the permit at issue "threatens the Town's environmental amenities, reputation, and value as a place to live, visit, and open a business." *Id.* at 1. In support of this contention, the attached declaration of Greg Lemons, Mayor of Abita Springs, provides that Helis's project has already damaged the Town's "image" and "brand"[8] and will continue to do so if the vertical well is drilled. (Rec. Doc. 70-3, at 2-4.) Because this brand is Abita Springs' primary draw for tourists,

---

[8] "Abita Springs' character and reputation as a place for healthy living, pristine water, and clean air is its brand, and a primary draw for current and prospective residents, businesses, and tourists. . . . In fact, the Town has expended resources successfully promoting this brand." (Rec. Doc. 70-1, at 22.) Mayor Lemons testified, "By brand I mean an image that the region, state, country, and world associate with Abita Springs." (Rec. Doc. 70-3, at 2.)

current residents, and future residents, Abita Springs argues that
harm to its brand threatens not only the Town's aesthetic interest
but this translates into an economic injury as well. (Rec. Doc.
70-1, at 22.) In addition, Abita Springs argues that the Helis
project could lead to contamination of the Southern Hills Aquifer,
the Town's water supply. *Id.* at 23. Second, Abita Springs claims
that its injuries are fairly traceable to the Corps' actions
because its injuries are caused by the Helis operation approved by
the Corps' permit. *Id.* Lastly, Abita Springs claims that the
procedural remedy it requests, that the Court vacate the permit
and remand to the Corps to provide for meaningful notice and
comment and for a proper alternatives analysis, may redress its
injuries. *Id.* at 24.

In its opposition, Helis contends that Abita Springs lacks
standing to bring this suit. (Rec. Doc. 71, at 7.) As an initial
matter, Helis argues that the Town must establish that the Corps'
alleged procedural failings have caused harm directly to the
municipality itself, as opposed to its residents. *Id.* at 8.
Moreover, because Abita Springs alleges violations of
environmental protection statues, Helis argues that Abita Springs
must demonstrate that its injury is environmental in nature. *Id.*
at 9. According to Helis, "the conclusory, unsupported, hearsay
allegations of Mayor Lemons are not sufficient to establish the
facts necessary for Plaintiff to carry its burden to demonstrate

13

that it has standing." *Id.* at 11. Helis argues that Abita Springs'
alleged injury is hypothetical and based on an incorrect perception
regarding the Phase 1 activity approved by the Corps' permit. *Id.*
at 13. For instance, Lemons's declaration references fracking
despite the fact that no fracking activity is authorized by the
permit at issue. *Id.* at 15. Furthermore, Helis points out that
Abita Springs has submitted no evidence that the activities
conducted pursuant to the permit at issue will pollute the
groundwater.[9] *Id.* at 12. Next, Helis argues that Abita Springs has
offered no evidence that the alleged harm is fairly traceable to
the Corps' actions. Rather, Helis argues the cause of Abita
Springs' injury "is the incorrect and unsubstantiated guess
allegedly held by an unquantified number of unnamed individuals"
that Helis's Phase 1 operations will pollute the groundwater. *Id.*
at 14.

The Corps provides similar arguments in opposition in its
cross-motion for summary judgment. (Rec. Doc. 76-1, at 11-15.)
According to the Corps, Abita Springs lacks standing because it
fails to establish that it will suffer an injury from the permit
at issue or that any such injury is fairly traceable to the Corps'
decision to grant the permit. *Id.* at 12. The Corps argues that the

---

[9] In contrast, Mike Barham, the Drilling and Completion Manager for Helis,
testified that the water within the Southern Hills Aquifer system "moves in a
south-southwest direction towards Lake Pontchartrain, away from Abita Springs."
(Rec. Doc. 71-1, at 3.)

Town's alleged harms are "tied almost exclusively to a definition of 'project' that conflates both the exploratory well at issue here and a second project for a fracking well that has not been applied for, much less permitted." *Id.* at 13. According to the Corps, such speculation regarding future harms from a different project provides no basis for standing. *Id.* at 13-14. Further, the Corps argues that the testimony provided by Abita Springs is not sufficiently particularized to support standing. For example, the Corps contends that Abita Springs does not establish how "the filling of 3.2 acres of wetlands several miles from [its] borders 'adversely impacts Abita Springs' aesthetic appeal.'" *Id.* at 14. In addition, the Corps argues that Abita Springs' allegations fail to establish standing because they are based upon the actions of third parties. *Id.* at 15 ("Plaintiff seems to base its allegations of injury on the independent 'perceptions' of residents or decisions of 'a number of people that have not come to Abita Springs.'"). In sum, while Abita Springs might have standing to challenge a subsequent permit related to fracking activities, the Corps contends that the Town lacks standing to challenge the exploratory permit at issue.

Abita Springs responds to the Corps' arguments in its opposition to the Corps' cross-motion. (Rec. Doc. 78, at 13.) First, Abita Springs argues that its injuries do not rely on the fracking aspect of the project. *Id.* at 13. According to Abita

Springs, the permit authorizes a drilling project and this alone injures its brand. Further, Abita Springs argues that the defendant's actions need not be the very last step in the chain of causation; therefore, to the extent that some of its injuries are tied to the fracking phase, this permit injures those interests. *Id.* at 14. Next, Abita Springs argues that damage to its brand is concrete and particularized. For example, the Town claims it will suffer aesthetically and Town life will be less enjoyable if the area of the project site becomes environmentally degraded. *Id.* at 16. Further, Abita Springs maintains that "aesthetic and environmental well-being are not only important ingredients in society in general, [but are] of paramount importance to Abita Springs and its residents." *Id.*

Abita Springs also maintains that it satisfies the prudential requirements for standing. (Rec. Doc. 70-1, at 24.) According to Abita Springs, its interests articulated in Lemons's declaration fall squarely within the "zone of interests" designed to be protected by the Clean Water Act and the National Environmental Policy Act. *Id.* Further, in its reply, Abita Springs argues that actual environmental injury is not required and that it is not required to prove its concerns will become a reality. (Rec. Doc. 82, at 8.)

2.   **Discussion**

Before reaching the merits of the instant motions for summary judgment, the Court must first determine whether Abita Springs has standing to challenge the permit at issue. Whether a plaintiff has standing to sue is a threshold jurisdictional question. *See, e.g.*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101-02 (1998). To satisfy Article III's standing requirements, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). In a procedural rights case, the plaintiff need not show that the procedural remedy he is requesting will in fact redress his injury. *Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015). In order to make this showing, the plaintiff must show that "the procedures in question are designed to protect some threatened concrete interest of [its] that is the

17

ultimate basis of [its] standing." *Glickman*, 156 F.3d at 613 (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992)).

As a municipality, Abita Springs may not simply assert the particularized injuries to the "concrete interests" of its citizens on their behalf. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002); *City of Safety Harbor v. Birchfield*, 529 F.2d 1251, 1256 n.7 (5th Cir. 1976). Rather, as a municipality, Abita Springs may sue to protect its own "proprietary interests," which might be congruent with those of its citizens. *City of Sausalito*, 386 F.3d at 1197. For example, courts have recognized that a municipality has an interest in its ability to enforce land-use and health regulations, its powers of revenue collection and taxation, its aesthetic appeal, and in protecting its natural resources from harm. *Id.* at 1198. Thus, in order to establish standing, Abita Springs must show that the Corps' actions caused harm to the Town itself, as opposed to its citizens.

In other circuits, courts have found standing for a municipality when concrete harm to its aesthetic or economic interests have been alleged. For example, in *City of Sausalito v. O'Neil*, the Ninth Circuit held that the city adequately alleged an Article III injury where it alleged that a National Park Service proposal would result in a detrimental increase in traffic and

18

crowds in the city's downtown area, affecting the city's management and public safety functions. *Id.* at 1198-99. Furthermore, the court held that the city asserted an injury to its aesthetic appeal because the congestion accompanying the proposal would "destroy the City's quiet, beauty, serenity and quaint and historic village character and attributes." *Id.* Because the city alleged that the aesthetic damage would erode its tax revenue, the injury was cognizable as both and aesthetic injury and an economic injury. *Id.* Similarly, in *City of Olmsted Falls v. FAA*, although it was "a close question," the District of Columbia Circuit held that a city located two miles from an airport satisfied Article III's injury requirement by alleging harm to its own economic interests based on the environmental impacts of an approved airport reconstruction project. 292 F.3d at 268.

In the instant case, Abita Springs uses the declaration of Mayor Lemons to provide facts in support of its standing arguments. As an initial matter, Helis and the Corps challenge the admissibility of several portions of Lemons's declaration on the grounds of lack of foundation and hearsay. (Rec. Docs. 71, at 11; 76-1, at 15 n.18.) "[O]n a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012); *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion

must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). The Federal Rules of Evidence define "hearsay" as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is inadmissible unless an exception applies.[10] Fed. R. Evid. 802. Furthermore, under Federal Rule of Evidence 602, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has "personal knowledge" of the matter. Fed. R. Evid. 602. Thus, while a witness may testify about his or her own perceptions, such testimony may not relate to the perceptions of others. *See* Fed. R. Evid. 602, 801(c), 802.

Helis and the Corps object to the portions of Lemons's declaration discussing the perceptions and decisions of unnamed Abita Springs residents. (*See* Rec. Doc. 70-3, at 4.) For example, Lemons testified that, with Helis's project imminent, "Abita Springs' residents and potential future residents *perceive* that they are not living in a pristine area but that, rather, they are living near 'oil city.'" *Id.* (emphasis added). Similarly, Lemons

---

[10] Rules 803, 804, and 807 set forth twenty-nine exceptions to the rule against hearsay.

testified that "Abita Springs' residents and potential future residents and businesses *perceive* that the Helis Oil project could lead to contamination of the Southern Hills Aquifer." *Id.* (emphasis added).[11] As the Corps and Helis argue, these portions of Lemons's declaration are inadmissible hearsay and lack the required showing of personal knowledge. Abita Springs simply responds, without explanation, that "the Mayor's discussion about what the Town's citizens perceive is based on his personal knowledge." (Rec. Doc. 78, at 18.) However, it is unclear how Lemons could have personal knowledge of what others perceive or will potentially perceive in the future. Moreover, Abita Springs does not argue that an exception to the rule against hearsay applies.[12]

Abita Springs has also offered evidence that some of its residents have already moved from the Town and potential visitors have refrained from coming to the Town because of the pending drilling project. (Rec. Doc. 70-3, at 4.) Specifically, Lemons testified, "We have had a number of people that have not come to Abita Springs because the pending drilling project is not something that they want to be around. We have also had folks move out or sell property already in part because of the Helis pending drilling

---

[11] In addition, Mayor Lemons testified that he spoke to a developer about an adjoining piece of land that the Town was interested in annexing. (Rec. Doc. 70-3, at 5.) In particular, Lemons stated, 'The developer told me he was not interested in developing that property into a residential area because of the Helis Oil project." *Id.*

[12] Instead, Abita Springs contends that the issue is not whether it is true that citizens are leaving or the developer will not locate there, but rather whether this evidences a "reasonable concern." (Rec. Doc. 82, at 9.)

project." *Id.* None of the residents who have moved away from Abita Springs or any of the people who decided not to travel to Abita Springs have provided declarations in this matter. Even assuming that Lemons has personal knowledge that an unspecified number of people have not come to Abita Springs or that some residents have moved away from the Town, there is no evidence sufficient to support a finding that Lemons has personal knowledge of their motives. Of course, even if these people told Lemons that they decided to move away or not to visit Abita Springs because of the Helis project, such statements would be hearsay unless Abita Springs establishes that an exception applies.

Now the Court considers whether the remaining portions of Lemons's declaration support a finding that Abita Springs has standing to challenge the permit at issue. As testified to in Lemons's declaration, "One of Abita Springs' core assets is its clean water, clean air, and healthy living." (Rec. Doc. 70-3, at 2.) Additionally, Lemons stated that one of his main projects as mayor has been to turn this asset into Abita Springs' "brand." *Id.* Indeed, Abita Springs has expended resources developing and promoting this brand. *Id.* According to Lemons, the Helis project adversely impacts Abita Springs' brand because it adversely impacts the Abita Springs image. *Id.* at 4. If Phase 1 of the Helis project proceeds, Lemons believes Abita Springs' brand will continue to be adversely impacted. *Id.* Similarly, Lemons testified

22

that the Helis project adversely impacts Abita Springs' aesthetic appeal, which, in turn, adversely affects Abita Springs' tax revenue from property taxes. *Id.* at 3. Moreover, Lemons is "concerned about the risk of the Helis project causing contamination of the water in the Southern Hills Aquifer . . . because each time you drill a hole through the aquifer, it is a potential point of failure." *Id.* at 5. The Town sells water from the aquifer; therefore, contamination would result in an economic injury. *Id.* In short, Abita Springs alleges that any activity associated with Helis's proposed oil exploration project, whether it be the development of a drill site for the drilling of a vertical exploratory well in Phase 1 or the drilling of a horizontal fracking well in Phase 2, adversely affects its brand and reputation as a place for healthy living, pristine water, and clean air.

Though Abita Springs may have a proprietary interest in its brand, aesthetic appeal, and natural resources,[13] it must allege sufficient harm to its proprietary interest caused by the approved Helis project. As mentioned above, the alleged injuries must be "actual or imminent, not conjectural or hypothetical," and fairly

---

[13] It is worth noting, however, that Abita Springs' arguments that the "Town life . . . will be less enjoyable if the area of the project site becomes environmentally degraded," may be inconsistent with the requirements of standing for a municipality. (Rec. Doc. 78, at 15-16.) Abita Springs is "effectively attempting to assert the alleged interests of its citizens under the doctrine of *parens patriae*," a theory of standing which is unavailable to municipalities. *City of Olmsted Falls*, 292 F.3d at 267; *accord City of Safety Harbor*, 529 F.2d at 1256 n.7.

traceable to the Corps' action in issuing Helis the permit at issue. *Friends of the Earth*, 528 U.S. at 180. Thus, the Supreme Court has repeatedly reiterated that "'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). In *City of Sausalito*, it was undisputed that the implementation of the National Park Service's plan would result in an increase in local traffic, an increase in air pollutant emissions, and an incremental contribution to the cumulative noise environment. 386 F.3d at 1199. The court therefore found that implementation of the plan would result in known, predictable consequences that the city identified as concrete injury. *Id.* Here, by contrast, the alleged injuries to Abita Springs' brand, aesthetic appeal, and natural resources are much less clear. Abita Springs has not provided much evidence in support of its arguments for standing. Even taking a generous reading of Abita Springs' materials, the alleged harm to its aesthetic and economic interests could be characterized as hypothetical or conjectural. Assuming Abita Springs meets it burden to prove standing, the Court nevertheless concludes that the Corps' decision to issue the permit was not arbitrary, capricious, or otherwise not in accordance with the law, for the reasons discussed below.

**B.   Adequacy of Public Notice**

**1.   Parties' Arguments**

Abita Springs contends that the Helis permit should be vacated because the Corps denied Abita Springs the right to meaningfully comment on the permit proposal. (Rec. Doc. 70-1, at 4.) Abita Springs alleges that the Corps issued the permit based on "critical information that was not available to the public during the comment period." *Id.* at 2. In other words, the Town argues that the Corps' notice did not include enough information to generate meaningful comment. *Id.* at 6. In particular, Abita Springs claims that the public notice did not include information necessary to evaluate the availability of practicable alternatives. *Id.* at 9. Without an alternatives analysis, Abita Springs argues public notice is insufficient to allow for meaningful comment. *Id.*

First, Abita Springs asserts that the alternatives evaluation was absent from the public notice because the Corps issued its public notice on an incomplete application. *Id.* at 7. According to Abita Springs, when the Corps noticed the Helis permit proposal for public comment, Helis had not provided an analysis of alternatives sufficient to rebut the presumption that non-wetland sites are available for its project. *Id.* at 8. In support of this argument, the Town cites the letter the Corps sent to Helis on December 4, 2014, asking Helis to respond to concerns that Helis had not considered alternative, non-wetland sites. *Id.* (citing AR

25

2968-70). Abita Springs claims this letter is evidence that additional information was required to complete the application. *Id.* Thus, Abita Springs argues that the Corps issued its public notice on an incomplete application. *Id.*

Second, Abita Springs alleges that the Corps relied on key information received after the public comment period closed. *Id.* at 9. Specifically, the Town argues that the Corps' analysis of alternatives was based on "more than 500 pages of additional information" that Helis provided on January 2, 2015. *Id.* at 9-10. Abita Springs claims that the Corps' explanation of why other sites are not practicable includes a detailed discussion about geologic information provided by control wells in the area of Helis's chosen site. *Id.* at 11 (citing AR 5338-39, 5341-42). The Town admits that Helis generally mentioned the existence of these control wells in its revised application; however, "none of the detailed information relied on by the Corps in its [Memorandum for Record] was included in Helis's application materials." *Id.* Moreover, while Helis apparently included a map with the location of these control wells in its revised application, Abita Springs claims that the Corps did not include the map in the information it made available to the public.[14] *Id.* at 11. n.3 (citing AR 556-67, 571-

---

[14] In its comments to the Corps on Helis's revised application, Abita Springs noted specifically, "Helis refers to a map of control wells which it designated as Attachment 1. Yet, this Attachment appears nowhere in the publicly noticed materials." AR 2151.

93). According to Abita Springs, the Corps identified these control wells for the first time in two maps attached as exhibits to its Memorandum for Record. *Id.* at 10 (citing AR 5412-13).

In addition, Abita Springs identifies two other sources of non-public information on which it claims the Corps improperly relied. One is the statement of Paul Lawless, Helis's Geological Manager for Unconventional Resources, which Helis submitted as Exhibit 11 to its response to the Corps' December 4 letter. *Id.* (citing AR 3558-59). Another source of non-public information on which Abita Springs claims the Corps relied is the Geologic Review meeting held on July 29, 2014.[15] *Id.* at 12. (citing AR 358-59, 400-05). The Town argues that the Corps makes clear that it relied on this information in its Memorandum for Record, in which it referenced the conclusion of a "consulting geologist" at the Geologic Review that no less damaging alternatives were available. *Id.* (citing 5340). In sum, Abita Springs maintains that the Corps' issuance of the Helis permit without providing an opportunity for public comment on information about alternatives violated the Clean Water Act and the National Environmental Policy Act.

In its cross-motion in opposition, the Corps contends that it properly determined that Helis's application was complete and published sufficient details of the project for public notice and

---

[15] The Corps admits that the Geologic Review meeting was not open to the public and that it denied Mayor Lemons's request to attend. (Rec. Doc. 40, at 11-12.)

comment.[16] (Rec. Doc. 76-1, at 15.) First, the Corps argues that Helis's permit application included detailed information, including maps and project drawings, which described the nature, location, and purpose of its proposed project; the amount and nature of discharge to wetlands; and the reasons for these discharges. *Id.* at 16 (citing AR 526-28). According to the Corps, the application also described the process and criteria Helis used to select the site and to evaluate other alternative sites, and it described its efforts to avoid and to minimize wetland and other impacts at the site. *Id.* (citing AR 538-40).

Second, the Corps asserts that the public notice provided sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment, as required by the Corps' regulations. *Id.* at 16-17 (citing AR 512-23). In addition, the Corps points out that it published Helis's permit application on its website and circulated to the media a press release concerning the project, which provided a link to the public notice and Helis's permit application. *Id.* at 17. Thus, the Corps maintains that it provided the public with more than sufficient information to generate meaningful comments, which is all that is required.

---

[16] Helis adopts and joins in the Corps' arguments regarding the adequacy of the administrative process in connection with the permit at issue. (Rec. Doc. 71, at 16.)

Third, the Corps claims that it asked Helis to respond to comments and concerns raised by the public about its application, as contemplated by the Corps' regulations. *Id.* According to the Corps, its request for Helis's response to these public comments is "precisely the type of information request that the Corps is authorized to make after the close of the public comment period." *Id.* (citing 33 C.F.R. § 325.2(a)(3)). Contrary to Abita Springs' argument, the Corps argues that its regulations do not require it to reopen the comment period upon receiving Helis's responses to the public comments. *Id.* Rather, the Corps explains that the district engineer has discretion to issue a supplemental, revised, or corrected public notice "if in his view there is a change in the application data that would affect the public's review of the proposal." *Id.* (emphasis omitted) (quoting 33 C.F.R. § 325(a)(2)). The Corps argues that it was not required to reopen public comment in this case because Helis's response on January 2, 2015, "simply provided more detailed background information" about Helis's consideration of topics discussed in its permit application. *Id.* at 18-19 (citing AR 538-40, 3623-27). Moreover, the Corps notes that it published Helis's responses on its public website. *Id.* at 19. Therefore, the Corps contends that it did not abuse its discretion in deciding not to reopen the public comment period after Helis responded to the public comments.

In its opposition to the Corps' cross-motion, Abita Springs claims that the Corps' argument that its notice and comment was sufficient does not address its reliance on critical information not available for public comment. (Rec. Doc. 78, at 10-11.) Abita Springs insists that the Corps was of the view that Helis had not yet rebutted the presumption that there are less damaging, practicable alternatives available when it sent the letter to Helis on December 4, 2014. *Id.* at 11-12. Because the Corps changed its mind after receiving Helis's response in January 2015, Abita Springs argues the additional information "[c]learly . . . affected the Corps' view of the proposal in a significant way." *Id.* at 12. For this reason, Abita Springs asserts that the Corps' determination that the information would not affect the public's view is arbitrary. *Id.*

In addition, Abita Springs argues that the Corps' publication of Helis's supplemental material on its website did not cure the notice and comment violation. *Id.* First, Abita Springs points out that the record does not reflect that the public was given notice as to the publication of this new information. *Id.* Second, the Corps did not officially provide for a comment period on these materials. *Id.* Even if the Corps accepted and considered late comments, Abita Springs argues that the public had no way to know that a late comment would be accepted. *Id.* at 13. Thus, Abita Springs maintains that the public was not provided with a

meaningful opportunity to comment on key information on which the Corps relied before ultimately granting Helis's permit.

### 2.  Discussion

Section 404 of the Clean Water Act authorizes the Secretary of the Army, acting through the Corps, to issue a permit for the discharge of dredged or fill material into navigable waters "after notice and opportunity for public hearings." 33 U.S.C. § 1344(a). The Corps must publish notice soliciting public comment within fifteen days after receipt of a complete application. 33 C.F.R. § 325.2(a)(2); 33 U.S.C. § 1344(a). If the application is incomplete, the Corps must request from the applicant any additional information necessary for a complete application. 33 C.F.R. § 325.2(a)(1). Generally, an application "must include a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice." *Id.* § 325.1(d)(1). Detailed engineering plans and specifications are not required; however, the application must describe "the location, purpose and need for the proposed activity; scheduling of the activity; the names and addresses of adjoining property owners; the location and dimensions of adjacent structures; and a list of authorizations required by other federal, interstate, state, or local agencies . . . including all approvals received or denials already made." *Id.* In short, a complete application is defined in terms of the sufficiency of the submitted materials to issue public

31

notice. *Id.* 325.1(d)(10) ("An application will be determined to be complete when sufficient information is received to issue public notice.").

Because completion is defined by the sufficiency of the submitted materials to warrant public notice, it is controlled by Corps' regulation that govern the content of a public notice. *See id.* § 325.3(a). Public notice serves as "the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest." *Id.* Accordingly, "[t]he notice must . . . include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." *Id.* Further, the regulation lists items of information that should be incorporated into the notice, including in relevant part "[a]ny other available information which may assist interested parties in evaluating the likely impact of the proposed activity, if any, on factors affecting the public interest." *Id.* § 325.3(a)(13). However, "[t]he issuance of a public notice will not be delayed to obtain information necessary to evaluate an application." *Id.* § 325.1(d)(10).

In the instant case, Plaintiff alleges that the Corps issued public notice before Helis's application was complete, and therefore the public notice was insufficient. As discussed above,

32

completion and public notice are inextricably linked. In order to determine whether the public notice was sufficient, the Court must consider whether the Corps' conclusion that Helis's permit application was complete at the time of issuance complies with the law. Yet, if the public notice was sufficient, then Helis's permit application must have been complete. *See id.* § 325.1(d)(10). Therefore, the Court will first consider whether the public notice issued by the Corps contained sufficient information to allow the public to meaningfully comment.

The Corps properly determined that Helis's application was complete and published sufficient notice for public comment. The Corps issued a Joint Public Notice on October 14, 2014. AR 512-23. As required by section 325.3(a), the notice included the following information: (1) the applicable statutory authorities for the application, AR 512; (2) name and address of the applicant, *id.*; (3) the contact information for the Corps employee who could provide additional information, *id.*; (4) the location of Helis's proposed project, *id.*; (5) a brief description of the proposed project, its purpose, and intended use, including a description of the types of structures that would be erected, AR 512-23; (6) drawings and plans showing the general and specific site location and character of all proposed activities, AR 516-23; (7) a statement of the Corps' knowledge on historic properties that could be affected by the project, AR 514; (8) a statement of the Corps'

knowledge on endangered species that could be affected by the project, *id.*; (9) a statement on the Corps' evaluation factors, *id.*; (10) the comment period, AR 513; (11) and a statement that any person may request, in writing, within the comment period specified in the notice, that a public hearing be held to consider the application, AR 515. Thus, the notice contained the required items of information listed in section 325.3(a).[17]

Abita Springs does not dispute that the notice satisfied the above-mentioned requirements. The Town argues, however, that the notice was deficient because it failed to include an adequate analysis of alternatives that encompassed other available sites regionally located. Although not explicitly required by section 325.3(a), such information would be required if it "may assist interested parties in evaluating the likely impact of the proposed activity . . . on factors affecting public interest." 33 C.F.R. § 325.3(a)(13). In support of this argument, Abita Springs cites *Ohio Valley Environmental Coalition v. United States Army Corps of Engineers*, 674 F. Supp. 2d 783 (S.D.W. Va. 2009). In *Ohio Valley*, the court held that the Corps unreasonably found that the

---

[17] Neither the Joint Public Notice nor Helis's revised permit application appears to contain a list of other governmental authorizations obtained or requested by Helis, including required certifications relative to water quality, coastal zone management, or marine structures, as required by section 325.3(a)(8). *See* AR 528 (leaving blank the space provided to list "Other Certificates or Approvals/Denials received"). Although Abita Springs pointed out this omission in its comments on Helis's application, *see* AR 2151, the Town makes no mention of it in its motions or memoranda. Accordingly, the Court does not consider whether the application and public notice are deficient in that regard.

applications were complete and issued public notices that "plainly did not contain sufficient information to allow for meaningful public comment." *Id.* at 801-02. In that case, the applicants did not submit information concerning proposed mitigation until after the public notices were issued and the comment periods closed. *Id.* at 794. Therefore, the notices contained no information on proposed compensatory mitigation, which was "the single most important" material issue for the Corps' determination. *Id.* at 804. For this reason, the court concluded that the public notices failed to provide an adequate opportunity for the public to comment. *Id.* at 807. However, the court declined to hold that the detailed information on mitigation submitted to the Corps after the close of the comment period was required to be released for public comment. *Id.* Rather, "the Corps was required to release *some* project-specific information on mitigation for public review and comment." *Id.* (emphasis added).

Here, the Corps released sufficient project-specific information on alternatives for public review and comment. In addition to the Joint Public Notice, the Corps published Helis's revised permit application on its website and circulated to the media a press release concerning the project.[18] Abita Springs

---

[18] *See Revised Helis Permit Application Available for 30-Day Public Comment*, New Orleans District, U.S. Army Corps of Engineers (Oct. 14, 2014), http://www.mvn.usace.army.mil/Media/NewsReleases/tabid/9286/Article/509958/revised-helis-permit-application-available-for-30-day-public-comment.aspx

reviewed Helis's revised application and referenced the application in comments it provided to the Corps. AR 2145-64. Helis's application stated that Helis will use the proposed vertical well "to obtain geologic data to confirm the production potential of a very specific subsurface geological zone." AR 538. Further, Helis explained that it sought to locate its proposed well site in an area where "information obtained from several previously drilled wells on the edge of the prospect (the 'control wells')" would be of the most benefit. AR 538-39. Accordingly, one of the factors Helis used in selecting the proposed site was "its proximity to the control wells." AR 539. However, "[b]ecause the control well area is so interspersed with jurisdictional wetlands[,] Helis could not identify a suitable drill site location within this area that did not encompass wetlands." *Id.* Therefore, Helis sought to select a site that would minimize the number of wetland acres impacted and that would meet its other site selection criteria. *Id.* Although the map attached as Attachment 1 to Helis's application was not included in the materials published by the Corps, the information released to the public was sufficient to allow for meaningful public comment. *See* 33 C.F.R. § 325.1(d)(1) (stating "detailed engineering plans and specifications are not required" to be included in a public notice); *Ohio Valley*, 674 F.

---

(providing a link to the Joint Public Notice and Helis's revised permit application).

Supp. 2d at 807 (declining to hold that detailed information was required to be released for public review and comment). Notably, the regulations do not require the Corps to include in the public notice all information necessary to evaluate the application. 33 C.F.R. § 325.1(d)(10) ("The issuance of a public notice will not be delayed to obtain information necessary to evaluate an application."). Therefore, the Corps' determination that Helis's application was complete at the time it issued public notice was not unreasonable, and the Corps provided the public an adequate opportunity to comment.

Abita Springs' argument that the Corps' violated the CWA and the regulations promulgated thereunder by failing to provide adequate notice and opportunity for comment on the additional information submitted by Helis after the close of the comment period also lacks merit. After the application is deemed complete and public notice is issued, the Corps considers the comments received in response to the public notice. *Id.* § 325.2(a)(3). Substantive comments are furnished to the permit applicant, and the applicant is allowed an opportunity to submit any further views it may wish to offer. *Id.* The district engineer is authorized to request that the applicant furnish its views on a particular issue if the district engineer determines, based on the comments received, that he must have the applicant's views in order to make a public interest determination. *Id.* The district engineer will

issue a supplemental, revised, or corrected public notice if in his view there is a change in the application data that would affect the public's review of the proposal. *Id.* § 325.2(a)(2).

"[N]othing in the CWA or the implementing regulations requires that the Army Corps allow an opportunity for the public to comment on an applicant's response to the original public comments." *Sierra Club v. U.S. Army Corps of Eng'rs*, 450 F. Supp. 2d 503, 535 (D.N.J. 2006) *vacated on other grounds,* 277 F. App'x 170 (3d Cir. 2008); *accord Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir. 1996); *B&B P'ship v. United States*, 133 F.3d 913, 1997 WL 787145, at *6-7 (4th Cir. 1997); *Sierra Club v. U.S. Army Corps of Eng'rs*, 935 F. Supp. 1556, 1581 (S.D. Ala. 1996). Instead, as indicated above, the Corps' regulations relegate the decision whether to provide supplemental notice and opportunity for comment to the discretion of the district engineer, "if in his view there is a change in the application data that would affect the public's review of the proposal." 33 C.F.R. § 325.2(a)(2). "Otherwise, the comment period could continue in a never-ending circle." *Sierra Club*, 450 F. Supp. 2d at 535.

Decisions made pursuant to an agency's discretionary authority are afforded substantial deference, especially if those decisions are based upon an agency's interpretation of its own regulations. *Belt v. EmCare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). As a

result, several courts considering this issue have concluded that the Corps' decision not to open a supplemental notice and comment period following the submission of additional information was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See,e.g.*, *Fund for Animals*, 85 F.3d at 545 (upholding Corps' decision not to reopen comment period after applicant added 2.5 mile access road to project that required filling additional wetlands after the close of the comment period); *B&B P'ship*, 1997 WL 787145, at *6-7 (upholding Corps' decision not to issue supplemental notice and solicit additional comments on materials submitted by applicant after close of the comment period); *Sierra Club*, 450 F. Supp. 2d at 535 (upholding Corps' decision not to open a supplemental notice and comment period after applicant's submission of materials that reflected only additional information rather than any appreciable change in data); *Galveston Beach to Bay Pres. v. U.S. Army Corps of Eng'rs*, No. G-07-0549, 2009 WL 689884, at *14 (S.D. Tex. Mar. 11, 2009) (upholding Corps' decision not to issue public notice on amended application where change to proposed design involved constructing a project smaller in scope and the public had already commented extensively on the original permit application); *Sierra Club*, 935 F. Supp. at 1581 (upholding Corps' decision not to issue supplemental public notice following applicant's submission of its third proposal because additional comments would not provide information to the Corps

that would assist in determining whether to grant or deny the permit application); *see also Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 996-97 (9th Cir. 1993) (upholding Corps' decision denying requests for a public hearing where Corps had provided adequate notice of permit application and Corps was aware of public sentiment on both sides of the issue).

Courts have determined that the Corps violated the requirement for public comment when the Corps relied on non-public information that differed substantially from the information released to the public. For example, in *National Wildlife Federation v. Marsh*, the court found that, because the Corps relied on information that was not released to the public for comment, and because the analysis and reasoning provided in that non-public information differed substantially from the information previously released for comment, the information ultimately released did not properly apprise the public of the rationale behind the Corps' decision. 568 F. Supp. 985, 994-96 (D.D.C. 1983); *see also Ohio Valley*, 674 F. Supp. 2d at 805-06 (finding that Corps violated CWA where information constituting the "rationale and pivotal data underlying the Corps' decision" was not released to the public for comment).

The Court concludes that Abita Springs fails to meet its burden of demonstrating that the Corps' decision not to issue a supplemental notice and comment period following Helis's

submission of additional information was arbitrary or capricious. The materials submitted by Helis on January 2, 2015, respond to a number of comments and requests for information from the public, the EPA, and the Corps. The portion of Helis's response regarding its analysis of alternatives comprises less than three pages and refers to twenty-two pages of exhibits. *See* AR 3624-26, 3618, 3816, 3821, 4095-107, 4109-113. Thus, Helis may have submitted more than 500 pages, but the relevant portion of those materials amounts to only twenty-five pages. The record does not indicate that the documents complained of rose to the level of "a change in the application data that would affect the public's review of the proposal." 33 C.F.R. § 325.2(a)(2).

As discussed above, Helis's revised permit application discussed its consideration of alternative sites for the project and its efforts to avoid and to minimize wetland impacts at the site. AR 538-40. Helis's response reflects only additional, more detailed information about Helis's consideration of these topics. AR 3623-26. Nothing in Helis's response differed substantially from the information previously provided in its permit application. *Compare* AR 538-40, *with* AR 3623-27. Unlike the non-public information in *Marsh*, which differed substantially from the information released to the public, 568 F. Supp. at 994-96; here, Helis's response simply provided more detailed information. Further, unlike the decision document in *Ohio Valley*, which

41

incorporated the entirety of the supplemental materials by reference and contained a twenty page discussion of the supplemental materials, 674 F. Supp. 2d at 795; here, the Corps' Memorandum for Record does not indicate that information included in Helis's response was central to the Corps' determination. Accordingly, the Corps' decision not to reopen the comment period was reasonable and does not reflect an abuse of discretion.

The Court also rejects Abita Springs' argument that the Corps' letter of December 4, 2014, demonstrates that the Corps considered Helis's application to be incomplete. In the letter, the Corps asked Helis to respond to concerns expressed by the EPA. AR 2968 ("The EPA is concerned that alternative non-wetland sites may exist that have not been considered by the applicant . . . ."). In addition, the Corps recited the applicable law: "For non-water dependent fill there is a presumption that less damaging alternative sites exist." AR 2969. The Corps stated it "presumes that there may be other available sites in this geographical area that would accommodate the applicant's desired goals for exploration of the Tuscaloosa Shale Play that would be environmentally less damaging." *Id.* Similarly, the Corps advised Helis that it cannot examine minimization and compensatory mitigation until the presumption is successfully rebutted. *Id.* In conclusion, the Corps requested that Helis provide a "detailed discussion about how the parameters for [its] alternative site

search was established." *Id.* In other words, the Corps asked Helis to respond to public comments and requested additional information that it "deem[ed] essential to make a public interest determination . . . of compliance with the section 404(b091) guidelines." 33 C.F.R. § 325.1. The Corps' regulations authorize such a request for information and mandate that the issuance of public notice not be delayed to obtain such information. *Id.* § 325.1(d)(10). Accordingly, the Corps' request for additional information on December 4, 2014, was proper.

Abita Springs also alleges that the public notice and comment period violated the requirements of NEPA. Although NEPA does not contain specific public comment and review procedures, public involvement lies at the heart of NEPA's procedural requirements. *See Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002); *California v. Block*, 690 F.2d 753, 770-71 (9th Cir. 1982). The significant role of public involvement is reflected in the Council on Environmental Quality ("CEQ") Guidelines. *See* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."). The CEQ Guidelines provide that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and that the information must be of "high quality." 40 C.F.R. § 1500.1(b). Moreover, NEPA requires that an Environmental

Assessment ("EA") include a discussion of alternatives and an analysis of environmental impacts of the proposal and alternative actions. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.9(b). Abita Springs argues that because an alternatives analysis was not present in materials released to the public and was integral to the Corps' decision to issue the permit, the Corps failed to comply with "NEPA's emphasis on the availability and robustness of public scrutiny." (Rec. Doc. 70-1, at 7.) For the same reasons expressed above, the Court finds that the Corps provided an adequate opportunity for public involvement.

Finally, even if the Corps' decision not to reopen the comment period amounted to procedural error, Abita Springs has failed to demonstrate that the absence of an opportunity to comment on the non-public information resulted in any prejudice that could be cured by remand. *See* 5 U.S.C. § 706 ("In [judicial review of agency action,] due account shall be taken of the rule of prejudicial error."). The rule of prejudicial error provides that a deficiency that has "no bearing on the procedure used or the substance of decision reached" shall not be the basis for reversing an agency's decision. *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011); *see also Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 61-62 (1st Cir. 2001) ("Agency missteps too may be disregarded where it is clear that a remand would accomplish nothing beyond further expense and delay."). For example, in *Sierra Club vs. United States*

44

*Army Corps of Engineers*, the court concluded that any deficiency in the public comment period was not prejudicial because the plaintiffs "failed to provide any reasonably specific indication of how they would have commented on these studies if they had had the opportunity to do so or how any such comments would have influenced the Army Corps' decision to issue the Permit to fill the 7.69 acres of wetlands." 450 F. Supp. 2d at 536; *see also Galveston Beach*, 2009 WL 689884, at *14 (finding absence of opportunity to comment was not prejudicial where the Corps "received extensive comments from the public" on the development over the years, the Corps "was well aware of the strong views held by the public," and plaintiffs failed to show that an additional opportunity to comment would have influenced the Corps' decision to issue the permit).

Here, the Corps has received extensive comments on Helis's proposed project since the time Helis initially applied for a permit. After issuing public notice on the original permit application, the Corps granted two time extensions to the comment period due to public interest, resulting in a comment period of over sixty days. AR 4950. After Helis revised its permit application to reduce the scope of its project, the Corps again issued public notice and provided another thirty days for public comment. AR 512-13. The Corps received hundreds of comments on Helis's revised permit application, including eighty comments

45

received and considered after the comment period closed. (Rec.
Doc. 35-1, at 3.) The Corps was well aware of the strong views
held by the public on Helis's proposed project. Abita Springs has
failed to provide any reasonably specific indication of how it
would have commented on the challenged documents if it had been
given an opportunity to do so or how any such comments would have
influenced the Corps' decision to issue the permit. Accordingly,
the Court concludes that the Corps' decision not to issue a
supplemental public notice was not violative of the APA, CWA, or
NEPA.

**C.   Alternatives Analysis**

    **1.   Parties' Arguments**

    Abita Springs contends that the Corps violated the CWA's
mandatory 404(b)(1) guidelines when it issued the permit because
it did not consider, or require Helis to evaluate, alternative
non-wetland sites for the project. (Rec. Doc. 70-1, at 13.)
Instead, the Town claims the Corps only considered other wetland
sites in the immediate vicinity of Helis's chosen site. *Id.* Abita
Springs asserts that, as a matter of law, the Corps must presume
that practicable alternatives are available that do not contain
wetlands. *Id.* at 15. However, according to Abita Springs, the Corps
failed to apply this mandatory presumption. *Id.* In support of this
argument, Abita Springs points out that the Corps' Memorandum for
Record does not mention the presumption. *Id.* at 16. Further, Abita

Springs maintains that the Corps' failure to analyze non-wetland sites is arbitrary and capricious. *Id.* at 17.

In opposition, Helis argues that the Corps properly applied the 404(b)(1) guidelines when it issued the permit. (Rec. Doc. 71, at 17.) As an initial matter, Helis distinguishes the drilling of the vertical exploratory well, which has already been approved by the state regulatory authorities, from the separate surface activity approved by the Corps. *Id.* "Given that the limited surface activity approved by the separate Corps permit necessarily must be linked to the location of the well," Helis argues that Abita Springs' entire alternatives argument "fails on its face." *Id.* In short, Helis asserts that the Corps permit does not approve the actual drilling of the well; therefore, no alternative drilling sites need be considered. *Id.*

Next, Helis argues that Abita Springs arguments fail to consider the purpose of Helis's vertical exploratory well, which is "to obtain geologic data to confirm the production of a *very specific subsurface geologic zone*." *Id.* at 18. Helis claims that the location was chosen because of the existence of information from nearby control wells, as evidenced in the administrative record, and the location was considered to be the least environmentally damaging practicable alternative. *Id.* In conclusion, Helis contends that Abita Springs has not demonstrated that the Corps' conclusion was arbitrary or capricious. *Id.* at 19.

47

In its cross-motion, the Corps asserts that it properly applied the guidelines in approving Helis's permit. (Rec. Doc. 76-1, at 19.) Contrary to Abita Springs' argument, the Corps argues that the guidelines do not provide that non-wetland alternatives must be considered in evaluating a permit application to fill wetlands. *Id.* Further, the Corps claims that the guidelines require the Corps to consider the overall project purposes in its evaluation of whether alternatives are practicable. *Id.* at 22. According to the Corps, Helis selected its proposed site based on its proximity to several control wells, consistent with the overall project purpose "to confirm the production potential of a very specific subsurface geologic zone." *Id.* at 20. Thus, Helis's "proposed project cannot be conducted and its purpose cannot be fulfilled by simply drilling a well anywhere within the established Tuscaloosa Marine Shale play." *Id.* at 21. Moreover, the Corps insists that it did not rely solely on Helis's analysis, but instead retained a geologist of the Louisiana Geologic Survey to provide his expertise in evaluating Helis's permit application. *Id.* In light of all the material in the administrative record, the Corps maintains that its evaluation of Helis's alternatives analysis and approval of the permit were not arbitrary or capricious. *Id.* at 22.

## 2.   Discussion

The Corps may not issue a permit for the discharge of dredged or fill material into navigable waters "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). The guidelines require that the Corps follow a two-step procedure in applying this standard. First, the Corps defines the project's "basic purpose." *See id.* § 230.10(a)(3). The "basic purpose" defines the project's purpose in broad and simple terms, with the objective of determining whether the proposed activity is "water dependent." *See id.* An activity is water dependent if it requires access or proximity to or siting within a "special aquatic site," such as a wetland, to fulfill its basic purpose. *Id.* For example, when a project's basic purpose is to provide boat access to a river, that activity is water dependent. *See Nat'l Wildlife Fed. v. Whistler,* 27 F.3d 1341, 1345-46 (8th Cir. 1994). On the other hand, a project with a basic purpose to extract limestone is not water dependent because mining limestone does not always require that the mine be located in a wetland. *Sierra Club v. Van Antwerp*, 362 F. App'x 100, 106-07 (11th Cir. 2010). Thus, even though the specific project may be highly location-dependent, the broad, location-neutral basic purpose can result in a finding of non-water dependency.

49

If the activity is not water dependent, the guidelines require the Corps to presume that practicable alternatives that do not involve wetlands are available. 40 C.F.R. § 230.10(a)(3). The Corps also presumes that all practicable alternatives that do not involve wetlands have less adverse impact on the aquatic environment. *Id.* However, classification of an activity as non-water dependent does not serve as an automatic bar to issuance of a permit. Both presumptions are rebuttable. "The determination that a project is non-water-dependent simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives." *La. Wildlife Fed'n, Inc. v. York*, 603 F. Supp. 518, 527 (W.D. La. 1984) *aff'd in part, vacated in part, remanded,* 761 F.2d 1044 (5th Cir. 1985). Once a project is determined to be non-water dependent, the burden shifts to the applicant to rebut the presumptions by clearly demonstrating that less damaging, practicable alternatives do not exist. 40 C.F.R. § 2310.10(a)(3). Thus, the Corps' determination of the project's basic purpose and water dependency are threshold questions that determine the procedure the Corps must follow in granting the applicant a permit. If the wrong decision is made, the required procedure will not be followed and the Corps' decision will be arbitrary. *Van Antwerp*, 362 F. App'x at 106.

Once the Corps determines the water dependency of the project, it no longer considers the basic project purpose, but analyzes the practicable alternatives in light of the project's overall

purposes. Even if non-wetland alternative sites exist, they must nevertheless be "practicable." An alternative is practicable only if "it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Put simply, to be practicable, an alternative must be able to fulfill the project's overall purpose. Accordingly, whereas the basic project purpose establishes water dependency and whether the rebuttable presumptions apply, the overall project purpose is used for evaluating the practicability of alternatives. *Id.*

The overall project purpose is defined more narrowly than the basic project purpose and is more specific to the applicant's proposed project. "The overall project purpose must be specific enough to define the applicant's needs, but not so restrictive as to preclude all discussion of alternatives." *Gouger v. U.S. Army Corps of Eng'rs*, 779 F. Supp. 2d 588, 605 (S.D. Tex. 2011) (quoting Army Corps of Engineers Standard Operating Procedures for the Regulatory Program at 7 (1999), http://www.saw.usace.army.mil/wetlands/Policies/SOPI.pdf). In defining the overall project purpose, the Corps must consider the applicant's needs "in the context of the desired geographic area of the development, and the type of project being proposed." *Id.* Under the guidelines, "not only is it permissible for the Corps to consider the applicant's objective; the Corps has a duty to take into account the objectives

of the applicant's project." *La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985).

The specific location of the project may be an important aspect of fulfilling the overall project purpose; therefore, location can limit what alternatives are considered practicable. For example, in *Gouger v. United States Army Corps of Engineers*, the court concluded that an overall project purpose of providing "residential lots along the [Gulf Intercoastal Waterway]" was not overly narrow, and thus not arbitrary and capricious, even though the basic project purpose of providing "residential housing" was determined to be non-water dependent. 779 F. Supp. 2d at 605. Although the overall project purpose limited the available alternatives, the court found that the Corps properly defined the overall project purpose in light of the geographic area of development and the applicant's stated goals. *Id.* at 605-07. Similarly, in *Stewart v. Potts*, the court found that a city's purpose of providing a local golf course for its citizens would be thwarted if the golf course could not be constructed within the city. 996 F. Supp. 668, 675-76 (S.D. Tex. 1998). Therefore, it was within the Corps' discretion to consider only alternatives within the city. *Id.; see also Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 186 (D.D.C. 2004) (holding that, where the applicant's stated purpose was "to provide a source of limestone for its existing mining operations in Lee County," the Corps was

not required to analyze alternatives that contemplated transporting limestone from elsewhere); *Nw. Envtl. Def. Ctr. v. Wood*, 947 F. Supp. 1371, 1377 (D. Or. 1996) (upholding Corps' decision, in conducting alternatives analysis, to restrict project's overall purpose to "the Eugene Area" in light of substantial evidence regarding the applicant's legitimate economic reasons for choosing to construct its semiconductor fabrication plant in that location).

In deciding whether the Corps properly applied the guidelines, the Court "must examine the administrative record—not as a chemist, biologist, or statistician, but as a reviewing court exercising its narrowly defined duty of holding agencies to certain minimal standards of rationality." *York*, 603 F. Supp. at 526. The Court must not conduct a de novo trial on the issue, substituting its own determination for that of the Corps. *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). Instead, the Court must simply review the Corps' decision, as supported by the administrative record, under the arbitrary and capricious standard. Even if the Court ultimately disagrees with the Corps' decision, the Court must affirm the decision unless it is arbitrary or capricious. *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976).

Here, the Corps' alternatives analysis was not arbitrary or capricious. The Corps properly considered Helis's objective "to obtain geologic data to confirm the production potential of a very

53

specific subsurface geologic zone which Helis has identified as a potentially significant source of previously undeveloped mineral resources." AR 527; *see also* AR 3624 ("[T]he purpose is to gather geologic data needed to determine whether a *new play* within the Tuscaloosa Marine Shale, . . . which appears *limited to the southern portion of St. Tammany Parish* only, has the required geological characteristics to [make it] an economically viable source of oil and gas production."); AR 4965 ("[T]he project purpose is to obtain data regarding whether the target formation in the TMS is economically viable for oil and gas production . . . ."). Similar to the court's reasoning in *Stewart*, Helis's purpose of constructing a test well to obtain data regarding a specific target formation located in the southern portion of St. Tammany Parish "would be thwarted if [the test well] could not be constructed within" the area known to contain the target formation. 996 F. Supp. at 675. Thus, it was within the Corps' discretion to consider alternatives only within the area containing the target formation.

Abita Springs emphasizes that the Corps' Memorandum for Record does not explicitly mention the presumption of non-wetland alternatives. However, nothing requires the Corps to mention the presumption in its decision document. It is clear from the administrative record that the Corps was aware of the presumption and it can reasonably be discerned that the Corps properly applied

the presumption. *See* AR 2969 (discussing the presumptions regarding practicable alternatives applicable to non-water-dependent projects and acknowledging that Helis's project is considered to be non-water dependent). After reviewing the materials provided by Helis, the public, and the Corps' own expert consultants, the Corps determined that only sites within the vicinity of the specific, targeted geologic formation would be practicable. *See* AR 4952-53 ("The project purpose is to gather the geologic data needed to determine whether the potential new sub-play within the TMS has the required geologic characteristics to make this formation an economically viable source of oil and gas production. This geologic formation appears to be confined to the southern portion of St. Tammany Parish, which limits the range of sites that would be suitable for the project."); *see also* AR 4096 ("The only conclusion that can be reached based upon the aforementioned geologic data is that the target zone is limited in areal extent to the southern portion of St. Tammany Parish in the vicinity of the Southern control wells.").

Although practicable alternatives that do not involve wetlands were presumed to be available, Helis rebutted that presumption once it clearly demonstrated that no offsite alternatives would be practicable for its project. The Corps need not analyze alternative sites that would not be practicable. In the preamble to the guidelines, the EPA states, "we emphasize that

the only alternatives which must be considered are *practicable* alternatives." Guidelines for Specification of Disposal Sites for Dredged Fill Material, 45 Fed. Reg. 85,339 (Dec. 24, 1980) (to be codified at 40 C.F.R. pt. 230). Moreover, in certain instances, it may be easier to examine practicability first. In addition, a Regulatory Guidance Letter issued by the Corps further supports the reasonableness of the Corps' site-specific alternatives analysis: "Some projects may be so site-specific . . . that no offsite alternative could be practicable. In such cases the alternatives analysis may appropriately be limited to onsite options only." Army Corps of Eng'rs, Regulatory Guidance Letter 93-02 (Aug. 23, 1993).

Abita Springs argues that the Corps cannot rely on a narrow definition of the project purpose to avoid an analysis of non-wetland alternatives. Although courts have warned about the dangers of an overly narrow project purpose, the Corps' project purpose is rarely rejected on such grounds. *Gouger*, 779 F. Supp. 2d at 606 (collecting cases).

> Rather, in many recent cases, involving multiple different circumstances, the Corps' project purpose definition has been upheld against a challenge that it was overly narrow. *See, e.g.*, [*Fla. Clean Water Network, Inc. v.*] *Grosskruger*, 587 F. Supp. 2d [1236,] 1247-48 [(M.D. Fla. 2008)] ("While there is always the danger that in defining a project purpose, the Corps will simply create a 'self-fulfilling prophecy,' on this record, the Court finds the Corps' decision . . . was neither an abuse of discretion nor arbitrary and capricious."); *Nat'l Wildlife Fed. v. Souza*, 2009 WL 3667070, at *20

(S.D. Fla. Oct. 23, 2009) ("[T]he Court does not find that the Corps's assessment was inadequate because it was based upon an overly narrow project purpose . . . . The Court finds the overall project purpose in the 2007 environmental assessment defines the applicants'[ ] needs without being so unduly restrictive as to preclude practicable alternatives."); *Great Rivers Habitat Alliance v. U.S. Army Corps of Eng'rs,* 437 F. Supp. 2d 1019, 1026-27 (E.D. Mo. 2006) ("The Corps properly defined the project purpose in accordance with the City's stated development objectives. The Court cannot conclude that the project purpose was defined in an overly narrow manner merely as a pretense for excluding other alternatives or artificially constraining the Corps' alternatives analysis."); *Northwest Env. Defense Ctr. v. Wood,* 947 F. Supp. 1371, 1377 (D. Or. 1996) ("In light of the substantial evidence in the record regarding Hyundai's legitimate economic reasons for choosing to construct its project in Eugene, the Corps' decision to restrict the project purpose to 'the Eugene area' was neither arbitrary nor capricious."); *see also Whistler,* 27 F.3d at 1346 ("The cumulative destruction of our nation's wetlands that would result if developers were permitted to artificially constrain the Corps' alternatives analysis by defining the projects' purpose in an overly narrow manner would frustrate the statute and its accompanying regulatory scheme. *We do not believe the case before us raises these concerns.*") (emphasis added).

*Id.* While one can attempt to distinguish these cases in any number of ways, their cumulative effect demonstrates that an "overly narrow" project purpose is a rare occurrence. *Id.*

    In its reply, Abita Springs relies largely on the dissenting opinion in *Sierra Club v. Van Antwerp*, 526 F.3d 1353 (11th Cir. 2008). In *Van Antwerp*, Judge Kravitch wrote, "The Corps effectively construed the project's basic purpose as mining *this* limestone out from underneath *these* wetlands. So construed, a conclusion of water-dependency is inevitable. But such a site-specific

formulation of a project's purpose could no doubt be formulated for every permit application, and routine acceptance of such formulations would emasculate the wetlands-protecting presumption, defeating its purpose." *Id.* at 1367 (Kravitch, J., dissenting). On remand, the district court held that the Corps acted arbitrarily and capriciously in determining that the basic purpose of the proposed mining was water dependent, and the Eleventh Circuit affirmed. *Van Antwerp*, 362 F. App'x at 107. However, *Van Antwerp* is clearly distinguishable from the instant case. In *Van Antwerp*, the Corps stated that the basic purpose of the project was to extract limestone. *Id.* at 106. The Corps then determined that the activity was water dependent because the applicant sought to mine limestone deposits situated in wetlands. *Id.* at 106-07. As a result, "the Corps failed to apply the presumption that practicable alternatives to mining limestone in the Lake Belt are available and did not shift the burden to the Mining Companies to clearly demonstrate that there are no practicable alternatives to mining in the area." *Id.* at 107. In short, the Eleventh Circuit concluded that the Corps could not relieve the applicant of its burden by arbitrarily determining that the proposed project was water dependent. *Id.* However, the Eleventh Circuit noted that "[t]his is not to say that the Mining Companies will be unable to satisfy their burden and demonstrate that there are no practicable alternatives to mining limestone in the Lake Belt." *Id.*

58

Here, the Corps did not improperly construe the basic project purpose to determine that Helis's project is water dependent and, therefore, free from the presumption of practicable alternatives. On the contrary, the Corps's determined that the basic purpose, energy resource exploration, "is not considered to be a water dependent activity." AR 4950. Therefore, unlike in *Van Antwerp*, the Corps required Helis to rebut the presumption by clearly demonstrating that there are no practicable non-wetland alternatives. Further, the Corps properly considered Helis's purpose and the geographical area of the development. Abita Springs would like the overall project purpose to be the same as the basic project purpose, basic energy exploration; however, the overall project purpose is more specific to the applicant's project than the basic project purpose. *Gouger*, 779 F. Supp. 2d at 605. "Moreover, it is not inconsistent to define the 'basic project purpose' as being non-water dependent, but then provide a specific 'overall project purpose' taking into consideration the applicant's needs, including the 'desired geographic area of the development, and the type of project being proposed.'" *Id.* (quoting Army Corps of Engineers Standard Operating Procedures for the Regulatory Program at 7). Accordingly, the project purpose used to evaluate alternatives was not overly narrow, even though it was narrower than the basic purpose used to determine the project's

water dependency, and thus not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

In sum, the Corps concluded that Helis rebutted the presumption by clearly demonstrating that no *practicable* alternatives that do not involve wetlands are available. AR 4965 ("Locations beyond the area containing the geological formation at sufficient thickness to allow horizontal production were not evaluated for potential sites, as a test well in those areas would not meet the project purpose. . . . Further, considering costs, logistics and potential impacts, areas that have no access by an existing road within a reasonable distance are not considered practicable or reasonable."); AR 4965 ("Because the project purpose is to obtain data regarding whether the target formation in the TMS is economically viable for oil and gas production, all potential sites must be located in an area known to contain that target formation."). Additionally, as discussed above, Helis provided a detailed explanation of the steps it took to select and configure a site that would minimize the number of wetland acres impacted. AR 539. After adequate investigation, the Corps concluded that the proposed site and project configuration is "the least environmentally damaging practicable alternative in accordance with 40 C.F.R. § 230.10(a)." AR 4965.

Having reviewed the administrative record, the Court concludes that the Corps' decision to issue the permit does not

violate the APA, CWA, or NEPA. There is nothing in the administrative record that supports Abita Springs' claim that the Corps' analysis of alternatives and decision to issue the permit were arbitrary, capricious, or otherwise not in accordance with the law. Consequently, the Court concludes that the Corps was not arbitrary and capricious in authorizing the proposed project and the Corps' decision must be upheld.

<u>**CONCLUSION**</u>

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's *First Motion for Partial Summary Judgment Vacating the U.S. Army Corps' Permit* **(Rec. Doc. 18)** is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's *Supplemental Motion for Summary Judgment Vacating the U.S. Army Corps' Permit* **(Rec. Doc. 70)** is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' *Cross-Motion for Summary Judgment* **(Rec. Doc. 76)** is **GRANTED.**

New Orleans, Louisiana, this 23rd day of December, 2015.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE